My name is Sarah Gannett, and together with David Voisin, I represent the appellant Thomas Stephen Sanders in this matter. The District Court permitted Mr. Sanders, a former Marine with undisputed brain damage who lived in a storage facility spare office, subsisted on canned soup and strawberry jam, convinced he was descended from aliens and tomato seeds would save the planet, to go to trial without a competency hearing, and in front of a jury selected in violation of the precept, the jurors may maintain religious scruples against the death penalty so long as they are able to uphold their oath and follow the law. These are the errors we propose to address today, unless the Court prefers otherwise, and they require reversal of his convictions and death sentences. With the Court's permission, I propose to address competency first, since it affects both convictions and the death sentences. The District Court was obligated sua sponte to hold a competency hearing in this matter, based on counsel's representation that Mr. Sanders was incompetent, pretrial indications of his incompetence, and lay and expert trial evidence in support. Under Droop v. Missouri, the Court should have accepted as true all possible evidence of incompetence, and this evidence easily met Pate v. Robinson's low threshold of sufficient doubt required for a hearing. At that point in time, had any expert opined that he was incompetent? At the time of the proffer, Your Honor? Yes. No. No expert had opined at that point, but in the proffer, counsel told the Court that they had conferred with their expert regarding this, and he anticipated from a psychiatric standpoint that their counsel would not get any better, but in fact would get worse. How come there wasn't a motion for a competency hearing? Counsel did not make a formal motion, but counsel all but made a motion in invoking the Dusky v. United States case, in their words, before the Court. And so counsel gave the Court all the information that it needed in order to proceed with a hearing at that time. Counsel told the Court, we have serious concerns about his competency to proceed in any regard at this point. So effectively, counsel did make the same kind of proffer it would have made, except for using the word hearing. And it's notable that Section 4241A places an equal obligation on counsel and the Court with regard to a hearing in a competency context. What do we know about, in the record, about how Mr. Sanders acted during the trial? The trial record does not reveal anything about his demeanor during the trial. So in addition to the proffer, what was in front of the district court as to potential inability of Mr. Sanders to assist his counsel or otherwise participate in the trial? So two things, Your Honor. At the penalty phase of the trial, there was testimony by multiple experts to brain damage on the part of Mr. Sanders and also to serious psychiatric illness. The brain damage affected, at a minimum, his language, concentration, and attention. And those three things certainly would have impacted his ability to communicate and understand the trial. A capital proceeding is a very complicated and extended proceeding. And the language, concentration, and attention of the defendant is required in a proceeding like that. And I would refer the Court to an Eleventh Circuit case, which we did not cite in our pleadings, United States v. Wingo, 789 F. 3rd 1226, which has an excellent discussion of the necessity of the participation of the defendant and his attentiveness to a complex proceeding. Secondly, the psychiatric illness of Mr. Sanders. The defense and government experts both agreed that he had serious psychiatric illness, including hallucinations and delusions. The agreement was- That does not mean on your face that you're incompetent. It doesn't mean on your face that you are incompetent, but the question for a competency hearing is just serious doubt. I'm sorry, reason to doubt, not even serious doubt, reason to doubt. So that testimony comes out, but counsel at that point even didn't say, wait, we need to stop the trial and have a competency hearing. Counsel did not at that time, but counsel had already done so, and the Court had chosen not- But that was before testimony had come in about hallucinations and delusions, right? It was, but counsel had already raised the prospect of psychiatric testimony in its proffer, and the Court had declined to order a hearing at that time. So counsel may have believed it was futile. But the important point is that the Court has an independent obligation because it is to serve as a safety net, and competency is such a fundamental right, it's such a floor for all of the constitutional rights that are exercised by a defendant during a capital trial, that the Court's obligation is exercised independent of what counsel may do. And the Supreme Court in both Drope and in Pate v. Robinson has emphasized the Court's obligation separate and apart from anything that counsel may do. In fact, in this case- Was there testimony about any of those experts during the penalty phase that said he was incompetent to stand trial? The experts did not say he was incompetent to stand trial during the penalty phase, but that was not the referral question for the purposes of the penalty phase. The penalty phase was directed at his moral culpability for the crime, not his ability to understand the nature of the proceedings, nor to assist counsel. And that is the reason- Counsel, I understand you have to work with the record that you have, and so do we. It does seem to me that perhaps there are some things to put the district court on notice. We do have the standard the district court's in the best position to analyze what is necessary at the time. Certainly, if in sentencing something further had been brought up, even if it's a little bit off point, there would be something else to evaluate. What would you say is your strongest piece of evidence, maybe it's a collective, that would cause us to say that the failure of sua sponte to order is a reversible error? I'd like to make- I don't think the proffer does that much. We'll have to evaluate that. When does a lie go off and the district judge erred by not ordering a competency hearing? I'd like to make two answers to that question, if I might. The first is that I think in the competency context, it's actually counsel who has the best viewpoint on the defendant's reasons to doubt the defendant's- We're viewing the district court's failure to order, and so he's in a better position than we are, I guess is all I'm saying. Well, I understand the court's position, but I think the Supreme Court has said that counsel's viewpoint on competency is very important in this evaluation. Secondly, I think the second- Could counsel move for a new trial? Counsel did move for a new trial, Your Honor. On competency? Not on competency, but again, and I think the court in Wingo emphasizes this in a very important way, that the district court should act as a safety net in this context. Should do what? Oh, safety net. Should act as a safety net in this context. I'm just responding. You said counsel was in the best position to know, and I was asking you, but counsel did not move for a new trial at the close of either phase of the trial for a new trial based on competency. No, but counsel had already raised the issue to the court, and the court did not act, so counsel was also- I don't think that exonerates counsel throughout the trial. I'm just asking the facts. I understand, Your Honor, and it's not, I think, a question of exonerating counsel or not, although that may well become a question on post-conviction if there's not a remand here. But I do think that we also have to look at what the district court's equal obligation is under Section 4241. To return to Judge Southlip's question about the best evidence, I think it's Mr. Sanders' psychiatric illness, and in particular his delusions, which are reflected both pretrial and at the penalty phase, and on which there is some agreement by all of the experts, even though the court is supposed to take on its face the evidence that's presented in looking at questions of competency, there is agreement by government and defense experts that Mr. Sanders was suffering from some delusions, and those delusions ranged from feeling he was being listened to, which might affect his willingness to communicate with counsel, to feeling that he could see into the future, which might affect his ability to understand whether, in fact, the death penalty would ultimately be imposed upon him, to believing that he had some vision on what would save the earth and whether he could communicate with beings on other planes. And we know from pretrial, which the judge knew at the time of the proffer, that when he was interviewed by police, he had trouble answering certain questions and not answering others. For instance, he was willing to say that he had committed the murders in this case, but not willing to answer questions about whether he worked for a mattress company. And he accused the police of cussing at him when there's no evidence from the record that police were cussing at him. Evidently, he was hearing that cussing from someone else. There's plenty of evidence of mental health problems that the fellow had throughout the evidence that we have in front of us, including the interrogations. But that's not obviously the question, and that's something I think a district judge has to evaluate. The Federal Public Defender is not asking for us to have a competency hearing. Maybe, you said the record's not terribly descriptive of this, perhaps Sanders was calm throughout the proceedings and seemed to be whispering in the ear or whatever. There was nothing about that that's in this record that caused the district judge to be concerned about competency. And as you say, even though in our review the district judge was in a better position than we are, I certainly think Judge Durell would be going pretty far afield without any request, and with a fairly calm defendant maybe sitting at the table, to take it upon himself to order a competency hearing when he's not been requested to do so. Your Honor, we know from DROPE that the Supreme Court – we know from DROPE v. Missouri that the Supreme Court has said that the district court should do just that and order a hearing no matter how, quote, inartfully drawn counsel's request might be. We also know that from Pate v. Robinson that the Supreme Court has warned against relying on whether the defendant made outbursts during the trial as the signal for whether a competency hearing is required. But we said in Mitchell that even when the defendant makes rambling statements and illogical statements at trial, that that's not an abuse of discretion for the district court not to order a competency hearing. So in the absence of the kind of evidence in this record that Judge Southwick is talking about, I don't understand how we could reach the opposite result here. We can reach the opposite result here because we have evidence at all levels, including a proffer from counsel, including evidence of brain damage, including evidence of psychiatric illness, and including social history, in other words, lay testimony that's supportive of the mental illness and the brain damage. Do you think that this case is worse than Mitchell? I think – And if so, how? I think the question – the issue here is that there – is whether there was a question – a substantial – sorry – is whether there was a question about the incompetence that should have raised the judge's inquiry at the time of the proffer. And all that would have required is for the judge to engage, simply to engage and to ask some questions, and potentially to hold a hearing. It needn't have derailed the trial, and it needn't have involved all of these additional proceedings. In Mitchell, the court found that the colloquies with the defendant demonstrated understanding of the proceedings. The court here didn't make that effort to find out whether the defendant was understanding the proceedings. And that's the essential distinction between this case and Mitchell. If I could turn now to the question of the excluded juror, which essentially is the same problem, the district court's failure to engage to find out whether the juror's views were actually impairing. The district court excluded her based on her expression of religious scruples in the questionnaire without asking her whether she could set aside those views in order to sit in this case. And without doing that, the only record that we have is that she held some religious views, but we don't know whether she would have been able to sit fairly in this case. And that record establishes a violation of the Witherspoon Rule and requires reversal under Gray. What the juror expressed here were beliefs. She did not express that she could not serve. She did not express that she would not apply the death penalty. What she expressed was that she did not know. And those are the kinds of beliefs and those are the kinds of expressions that voir dire is made for. And that is the practice of courts in this circuit. We are unable to find any case in which a court on a similar record in this circuit did not inquire further of the juror before dismissing them in a capital case. Was there an objection to her dismissal? There was an objection to her dismissal, Your Honor. What was the request? The request was that she be bound over for voir dire along with the other jurors in the pool. And, in fact, there were other jurors. We've noted them at page 29 of our reply, but I encourage the court to look particularly at jurors 25 and 36. Juror 25 can be found at pages 41, 31, and 66, 70 of the record, and juror 36 can be found at page 42, 98, and 68, 79 of the record. These are both jurors who expressed religious scruples and who expressed in their questionnaires extreme views about the death penalty, but who were permitted to attend voir dire and who, by the time they were finished with voir dire, the district court expressed finding that they should be able to serve. One was excused on agreement of the parties despite the district court's so finding, and the other was held over as part of the pool and eventually dismissed on a peremptory challenge by the prosecutor. But there's no explanation for why this juror should have been treated any differently. Well, she said she did not know whether she could consider everything presented at sentencing, right? What she said was, the question was, what sentence would you impose? And she said, don't know. That was her answer on the questionnaire. I'm looking at 5662 to 5680. Am I in the wrong spot of the record? That's correct, Your Honor. So I thought the question presented that she says she does not know is whether she can consider everything presented at the sentencing trial, not what sentence she would impose. Question 18 is, if you were responsible for sentencing someone found guilty of a very serious crime and if you could impose any punishment, would you? And then it has a list. And among the things on that list is consider everything presented for sentencing. But the other items include automatically give the maximum, automatically give the death penalty, and so forth. And her answer was, don't know. But that don't know is a perfect opening for inquiry in voir dire. And the court could have inquired, what did you mean by that? And more importantly, could have instructed her on the law and said, the law requires that you be able to consider everything presented, that you set aside your religious beliefs, and that you apply the law as I instruct you about it. And what we know is that many jurors are able to then set aside their religious beliefs, as Juror 25 and Juror 36 promised to do. And follow the court's instructions. And, in fact, some religious teachings, including Romans 13, 1 to 2, instruct that you shall follow the government because it was put there by God. And we have no way of knowing whether this juror would have followed those sorts of instructions, whether biblical or legal, as well. Before you run out of time, let me ask you to turn to the interrogations and the continuation of questioning in the third interrogation in particular, after maybe sufficiently invoking a right to counsel. Why don't you address that issue? So the issue of Mr. Sanders' statements is a little bit of a tricky issue to analyze. He very clearly invokes his right to counsel in that third segment of the interrogation. And there is some questioning that follows, which is invoked in the prosecutor's closing argument. The question of the harm on this issue also relies on the court making a finding that the earlier invocations, which are not recorded, were in violation of his right to counsel and were unqualified. And that's trickier to do because we don't have a recording of those statements. Those statements were taken by the police. Well, assuming we accept at face value what the officers said, where does that leave us? That leaves the court with a mixed record. Some of the statements that Mr. Sanders made after the initial supposedly qualified invocations would have been admissible. Some of the statements which were made after the unqualified invocation would have been inadmissible. And it leaves a very murky, harmless error question. What do you say is the first unqualified request for counsel? It's the one that Judge Southwick identified that is in the recorded statement, Your Honor. Let me ask you about the setup for that last interrogation, or the last one we're going to talk about, I guess. These are officers who are not involved in the previous two periods that we call the first and second, or you two have called the first and second interrogations. What kind of handoff was there, if any, from law enforcement to these new people coming on? I thought there was something in the record about what the previous officers told these interrogators. And the main point is would they have had knowledge of these equivocal, odd requests for counsel that came up in the previous interrogations? The record does not make clear whether they had knowledge of those invocations. They did have knowledge that he made a statement. When you say it's not clear, it doesn't say one way or the other? It doesn't say one way or the other, Your Honor. It seems to me that if you have a series of interrogations by the same group, or knowledge of each interrogation by the final ones, what do you say that under Smith v. Illinois and even under Davis, the Supreme Courts, that that sort of backstory, that sort of knowledge of the ambiguities when this fellow invokes desire for counsel, that those sort of ambiguities continue in play, and particularly in light of, as you have already alluded to in your previous comments on another issue, in response to asking him about whether he worked for a mattress company. It's just an odd place to invoke counsel. And what he doesn't seem to have liked to talk about before was talking about other people. And then his follow-up question after the mattress issue came up is he said the same thing. I don't want to talk about other people. Doesn't that all sort of fit together and allow the interrogators to at least find out is he doing this again? We think there were a lot of irregularities in the way that law enforcement handled this, Your Honor. They supposedly had visited the location where they arrested Mr. Smith. So you're talking about what happened here. I'm asking you to respond, but on the basic premise, if interrogators know that this fellow has invoked counsel before in an exact, inconclusive way, and it turns out immediately he was willing to talk thereafter, let's just say that's the premise here. If he does it in a more direct way, as he did here, but with this backstory known to interrogators, are you saying they could not proceed to find out if he's just doing that again? And then you can tell me why those aren't the facts of our case. Your Honor, I think because he directly invoked, they were not permitted to follow up and ask about what. Had he said anything? What's the best case that says that? The best case that says that is cited in our briefs, Your Honor, and it's directly on point, and I'll have to bring it to you. Well, is it the 1984 Smith v. Illinois? I think there's a better case, Your Honor, and I apologize. The only reason I say that, Smith more or less says that, but it has a caveat in it, that we're not dealing with a situation when some of the things that preceded makes that invocation less clear. But the language that he used in his invocation was perfectly clear. There was no ambiguity to it whatsoever. He said, I want to talk to a lawyer. It's not a situation where there was any ambiguity in the phrasing at all, and they are not permitted at that point to make the uncalled follow-up about what. And when they do that, they are in violation of his constitutional rights. So that occurred when, and that you say that is the first unequivocal request? That's the first recorded unequivocal request. And there's no evidence of other unequivocal. You say the evidence is not as good as it should be, but insofar as what the district judge had to make the resolution on, those others fit within, if you accept the facts as the district court did, fit within the general sense of equivocal invocations. We think it's a fair inference, Your Honor, that Mr. Sanders would not go from making equivocal invocations to suddenly making an unequivocal one. So the fact that there's the only recorded invocation on this record is an unequivocal invocation, we think creates a fair inference that the earlier invocations were also unequivocal. Who gets to make that inference? District judge initially? Doesn't the district judge get to make those inferences initially? The district judge does get to make that inference initially, but we think it was clear error in light of the Department of Justice's policy, which says that the best way to know when a defendant is invoking his rights and whether his rights are being adequately protected is to record those proceedings. When did he first start cooperating about the location of Sue Ellen's body? When he was brought to the station. That's at the second interview? That's at the second interview, correct. Is that where they had the lengthy discussion about the pile of rocks? That's correct, Your Honor. In the second interrogation, not the recorded one. That is on a recording, Your Honor. But it was the first, not the third. It was the second. I'm sorry, second. Second, Your Honor. Thank you. Thank you. Good morning. May it please the Court. V.J. Shanker for the United States. Your Honors, if I may, I'd like to start with where the Court just left off, and that would allow me to correct the record on one issue that Judge Southwick was raising. The record actually does show, and I recognize that this undermines our argument in some respect, but I just want to make the record clear. It does show that the agents who interrogated Mr. Shanker and Mr. Sanders the third time were not aware that he had previously perhaps invoked the right to counsel with respect to some questions. No, it wasn't explicit. I don't know if you were implying anything. We do have some evidence of what they were told. Yes, that he had confessed, and they did have some information about what he had said already. No, they did know that he was interviewed and they knew what he had said, but if I can point the Court to ROA 1737, this is the suppression hearing, and one of the agents was asked, we learned that he was cooperative and that he had confessed, and so that's what they were told during the handoff. And then the question to the agent was, did you hear anything about whether he had invoked his right to an attorney, either generally or as to any specific questions, and the agent answered, no, ma'am, we did not. So I would note that they did not know that there had been even ambiguous requests for counsel. Why weren't they told? I don't know that, Your Honor. I don't know. When did he first get counsel? I don't know when he first obtained counsel. I know that he did not have counsel at this point. And again, he had explicitly signed multiple advice waivers waiving his right to counsel. But he had clearly asked for counsel more than once, and yet someone kept approaching him about continuing to interrogate him, and if he'd had counsel, that would not have happened. Your Honor, again, a defendant is permitted to answer questions without counsel present. Now, if he does invoke the right to counsel, questioning about that person's criminal activities must stop, but the questions can be limited and tailored under the cases we cited in our brief, and they clearly were here. Every time Mr. Sanders asked for counsel, he did it with respect to a specific subject matter, and every time the agent then clarified, just to be clear, are you only talking about that specific area, and Mr. Sanders said yes. Mr. Sanders unequivocally showed an eagerness to talk about the conduct at issue here, and yet a decision not to speak about other areas. And he may have had perfectly rational reasons to do that. He may have had irrational reasons to do that. That's not really something that the agents have to concern themselves with, but he clearly limited his request for counsel. Mr. Shanker, it seems to me that that argument fits better on the earlier invocations than in this last one and the third interrogation, which is why I was asking your friend on the other side about the back story that the interrogators would have known. Sanders says, you can probably quote it without my reading it to you, I want to talk to a lawyer, stop cussing me, but I want to talk to a lawyer. It does seem to me that if there is a rule that some invocation of the right to counsel or desiring counsel that does not in itself have any qualification, and absent some preceding information maybe that would put the interrogator on notice that this may not be actually an invocation of counsel, and I don't think these interrogators had that, the third group, that game is over. You find counsel. You stop an interrogation. Is that not the law? Is that not the right way to look at these facts? What do you do with what I just said? The best case for us on that is one that we cited in our brief, which is U.S. v. Carrillo, and the site is 660 F. 3rd, 914. We cite that in our brief. And what the court said in Carrillo is that even when the defendant's comments in that case, which were I wish I had a lawyer here, I want to see if I can push this to where I can get my lawyer, and I want to see if you can push this, sorry, he basically said the same thing, this court said that these comments, when viewed in isolation, do appear to constitute a clear invocation of the right to counsel. However, the agents were permitted to consider the context in which those invocations were raised. And so this court makes clear that even if the exact words may seem on their face unambiguous, that the court looks at the context in which the agents were operating. But they didn't have a context that helps you, do they? I think they did, Your Honor. These interrogators. Yes. So even if we assume, and we must assume because the record shows it, that they didn't know what happened in the previous two interrogations, what they had here were, first of all, a signed waiver of the right to counsel, an eagerness to talk about the crimes that Mr. Sanders had committed, an eagerness to lead the agents to the body. And so clearly there was something that he was happy to talk about. Now, if you listen to the transcript, I'm sorry, the recording of this interview, it actually becomes much more clear how this actually played out in terms of an interrogator and a defendant. And Agent Walsh asked him, it looks like you worked for a mattress company. And you can almost visualize it. Again, I'm giving you my interpretation, so I don't want to say that that's the only interpretation. But you can almost visualize Mr. Sanders suddenly rising up and saying, I want to talk to a lawyer. And it seemed so sudden and out of place that Agent Walsh, and I will make this, this is very important. What difference does it make if it's sudden or out of place? He said it. But the reason it's important is that Agent Walsh was simply seeking to clarify. He didn't ask him further questions. The Supreme Court said you can't do that. Well, I think the Supreme Court has said that you can clarify if the request is ambiguous, and this Court has said the request can be ambiguous if viewed in context. When did he start cooperating about where Sue Ellen's body was located, before or after that statement? Well before that statement, even before that interview. But before that statement, during that interview, the first 48 minutes of this interrogation were Mr. Sanders trying to lead agents to Sue Ellen's body. So if this question came at, I mean, a lot of pages here at the 48-minute mark, he'd have been talking for that long to this third group of interrogators? I can tell you. I mean, roughly. The statement occurred at — It didn't go on much longer after that exchange. That statement occurred at the 50 minutes and 35-second mark of the third interrogation, after he had already confessed to the crime and was trying to lead the agents to the body. And he suddenly jumped up and said, I want to talk to a lawyer after being asked about working for a mattress company. And, again, importantly, Agent Walsh didn't proceed to ask him substantive questions about the crime. He simply sought to clarify, and he said about what. And I don't — I'm not aware of any case that says no more words can be spoken after a different — What after that do they say was prejudicial or harmful? Well, the only thing that they say is prejudicial — they have only argued for suppression with respect to the penalty phase, and only to the extent the government used some information after that point in its closing argument. What was the information they say was used after that point? Well, actually, after that point — so their argument was that Mr. Sanders' ability to lead agents to Sue Ellen's body showed that he possessed some level of — I thought you said he had already told them about Sue Ellen. Right. But, I mean, this is — I'm characterizing their argument. Of course, they can correct me if I'm wrong on rebuttal. But their argument in their brief was that this was prejudicial because the agent — I mean, sorry, the government, in closing argument in the penalty phase, used his ability to lead agents to Sue Ellen's body to show that he possessed some level of executive functioning, and that the government raised — But you don't argue in your brief, well, he'd already done that before — Oh, I — we did, Your Honor. I didn't see that. We argued a harmless error. Well, I saw that, but you didn't get into the specifics. You were not very specific in your brief. Well, we argued that we had other bases to show that he had executive functioning. Right, but you didn't get into the specifics about when in — during the course of this, the main thing that they were pointing at is his ability to tell them where Sue Ellen's body was, because I don't understand their argument. Yes, that's right. And they — and the government did use that information to extensively cross-examine mental health experts, talked about it in closing argument. So to the extent that there's a plausible argument that it was in — that all of that came out before he had a clear invocation, it would have been helpful for you to explain that to us. I apologize, Your Honor. I mean — Is that the case? That is definitely the case, Your Honor. It's abundantly clear from the transcript. Fifty minutes of discussion of where Sue Ellen's body was before this statement, this particular statement. When did he say, I want to talk to a lawyer about the death penalty? That was at the very end of the interview. And that's when the interview was cut off. That starts about at the one-hour, three-minute period. And that's literally his last two or three sentences. And that's when the agents cut off the interview. If I could move on to competency. What we had here was an ex parte proffer raised on the morning of trial. Now, we would submit that if Mr. Sanders had truly been incompetent before this period, defense counsel would have raised this much earlier. The other point is that this proffer raised on the first day of trial was preceded by eight days of jury selection, full-day proceedings in front of the court with Mr. Sanders present. And the record reflects that he was, in fact, present during those eight days of jury selection. That provided the district court with ample opportunity to observe Mr. Sanders. There is nothing in the record, and my colleagues have made no argument, that Mr. Sanders showed any signs of incompetence during those eight days of jury selection. Now, the ex parte proffer in particular provides no specifics, no examples. If there had been anything to point to, Mr. Sanders is refusing to talk to us, Mr. Sanders is holed up in his cell in a corner and not coming out, anything like that, you would presume that would have been in the proffer. There was nothing. Now, this court has set forth three factors for district courts to look at when determining whether to sue a sponte order or competency hearing, and none of those factors were satisfied here. If an argument by defense counsel on the morning of trial is sufficient to require a district court to hold a hearing, then the statute would require that hearings are mandatory upon defense counsel motion. It simply doesn't do that. It does leave it up to the district court, and none of the factors were satisfied here. Was some general, as far as the record shows, some general explanation of his mental health presented to the district court either in pretrial motions or otherwise. The sense of it just fell as either from birth defects and childhood upbringing or whatever else, a number of significant cognition problems. How much of that was in front of the district judge in some form? Your Honor, I'm not aware of any of that being in front of the district judge in any form. Now, my colleague said otherwise, I believe, in her opening argument, so I am open to being corrected if I'm wrong when she resumes the podium. But I'm not aware of any of that being before the district court. The only possibility I can think of, and I was thinking of it as I was sitting there, is that perhaps the expert reports were filed with the district court in advance of trial, perhaps for a Daubert hearing or that sort of thing. That may be what my colleague is thinking of, but I'm not sure. At the very least, competency was never raised with the district court until the morning of trial. The last thing I want to touch on is the challenge for cause of the juror, and I will acknowledge error at this point and apologize to the court. We, in our brief, failed to recognize that Gravey, Mississippi, which my colleagues cited in their reply brief, governs here. We had argued that harmless error would apply here, and I apologize. Gravey, Mississippi does say that in the capital context, Witherspoon or Witt error is not subject to harmless error review. That said, we maintain that there was no error here. The potential juror's statements here, at the very least, showed a substantial impairment in the ability to apply the instructions of the district court. The case law is clear that the potential juror need not indicate that he or she would never be able to impose the death sentence, nor does the case law require that the potential juror's statements be unambiguous. And finally, the case law does not require voir dire. And so what we have here are quite strong statements by this potential juror. They were not just statements about religious views. They were statements about how religious views would prevent her from imposing the capital punishment. If the court has no further questions, government's happy to rest on its briefs. Thank you. Thank you. To answer the court's question about the cases that governs the statements and the unequivocal nature of the invocation, I refer the court to page 19 of our reply brief, which does cite United States versus Ivy. It's a Fifth Circuit case. I think that the government's characterization of the statement and the process by which it was given supports our competency claim. And the way that Mr. Sanders behaved during the taking of the statement is indicative of the mental health issues with which he struggled. The pre-trial, the other pre-trial indications that the district court had were apparent in the 12.2 litigation, in the jury questionnaire that was submitted by the defense, which included extensive questioning on various mental health issues, and also in the ex parte conference that the district court had before the proffer was made, which led the proffer to occur. We don't know the contents of that, but the district court indicates at page 1997 of the record that it had a short conference with the defense and there was a matter on which he was going to allow them to make a private proffer on the record. At a minimum, we think that remand is required to further address what the district court knew and didn't know and why it declined to order a competency hearing on this very serious record. The Supreme Court has indicated that no one factor should be dispositive in the competency inquiry, and here we think that sufficient questions were raised about Mr. Sanders' competency, that the court cannot be confident he was competent at his death penalty trial. I'd like to address a few issues about the juror who was excluded from this trial. I think it's important for the court to recognize that we're dealing here with a person with a ninth grade education, someone who is a working person whose questionnaire may not have used the most sophisticated language, but this is the kind of person I think that courts and certainly the federal government in the jury statute, which is very permissive about jury service, wants as a part of our fair cross-section requirements for service. The government says that there's no requirement for voir dire, but this court has never ruled on the issue whether voir dire should be required in a capital case, and we have made the argument in our briefing certainly that the court should not exclude a juror whose questionnaire presents in this fashion without voir dire. There's been no case cited, no capital case certainly, in this jurisdiction where the court has not conducted voir dire, and even in those cases where there has been a juror questionnaire that has been more seriously scrupled than the one in this case, like Bernard, the court conducted voir dire, and it was on the basis of voir dire that this court affirmed. So in voir dire, the jurors did not just say, as in this case, I do not want to do something. It said I cannot do something, and the district court still granted voir dire of that juror, and it was on the basis of the court's view of that juror and perspective on her credibility and demeanor that this court affirmed the exclusion of that juror. Here, the juror did not get the opportunity to be instructed on the law to learn what the standards are, that she should set aside her views about religion and be able to follow the instructions of the court, and that if she did that, she might be permitted to serve, and we don't know what her answers would have been. But we have three different answers that say man is not supposed to judge. I'm looking at 5665. God should judge, not man. The Bible says do not kill. If you kill, you're just as bad as the man who did the killing. If you kill someone, you're just as bad. This is not right in God's sight. So if she had said that in voir dire, you would agree that she'd have to be struck for cause, right? If she had said I cannot set aside those views and fairly judge this case, then we would agree, but she did not say that, and the Supreme Court has been clear that you may hold those views and still serve. And since she did not – I don't think the Supreme Court has said exactly that. It has said that you may hold religious scruples about the death penalty. Scruples are one thing, but to say I cannot in good conscience impose the death penalty, they've never said that. She did not say that on this record, Your Honor. Do not judge. That's God's job. Right, but she did not say I cannot judge. But that was in response to a question of what would you do if you were called to judge, if you were responsible for sentencing someone, the question we were talking about earlier, 18. Do not judge. That's God's job. I see that my time is up. I do have a response to that, if I may. The defense proposed question 74 for the questionnaire, which the district judge declined to give, and it asked, You are required to accept the law as the judge explains it to you, even if you do not like the law or disagree with it in determining both the guilt or innocence of the defendant and the appropriate sentence. Will you have difficulty following this rule of law? If she had answered that she would have difficulty, that would be a different question. But in question 62, when she was asked if she would have any trouble being fair in this case, she answered no. And there were several other questions in the questionnaire that indicated her ability to be fair, which we've cited in our brief. And on that record, we believe it was wrong to exclude her without giving her the opportunity to answer questions. Thank you. That will conclude the arguments for today. The court is in recess until tomorrow morning.